UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No.: 04-30046-09-MAP

UNITED STATES OF AMERICA,

v.

JONATHAN FREDERICK

**SENTENCING MEMORANDUM OF THE DEFENDANT,
JONATHAN FREDERICK**

Jonathan Frederick, the defendant in the above-referenced, hereby comments upon the Presentence Report in this matter, as revised on September 14, 2006 ("PSR"), and respectfully requests that his sentence reflect the considerations set forth below.

1. *The Defendant.*

Jonathan Frederick was born on March 15, 1962. He is forty-four years old. Jon was married for fourteen years to Lisa Nutile. Jon is the father of three sons born of this marriage; Jordan, age 19; Alexander, age 17 and Sawyer, age 12. Unfortunately, his marriage to Lisa ended in divorce in 1997. Jon maintains joint physical and legal custody of his sons, who are all honors students. He maintains and cherishes a close relationship with them.

In 2001, Jon was remarried to Rachel Loyola. Another son, Jacob, was born of this marriage. He is six years old and also excels in school. The Frederick family resides in a home they own in a working class neighborhood in Agawam. Jon has no criminal record whatsoever. Apart from his transgressions in this case, which respectfully he does not mean

to minimize, his life has been characterized by hard work, devotion to family and respect for the law.

Jon is a 1980 graduate of Nashua Senior High School in Nashua, New Hampshire. He continued his education at the University of New Hampshire in Durham, majoring in chemical engineering. After two and one half semesters at UNH, he withdrew to meet his domestic obligations. Although he dreams of doing so, he has yet to earn a college degree.

During the past 20 years, Jon has been a licensed real estate appraiser. He was employed by others in that capacity until 1992, when he formed his own business, West Side Appraisal. In November of 2005, he was required to terminate that business and his profession as an appraiser when his Massachusetts license was revoked a result of this proceeding. During this 20 period ending with the loss of his license, Jon has been consistently engaged on a full time basis as an appraiser. His more recent annual earnings were in the $70K range.

John is the sole breadwinner for his family. The loss of his appraisal license and income have resulted in significant financial hardship to Jon and his family. They are now required to make ends meet with a monthly income of $2,600, generated by four rental properties which he has improved and now rents. Although Jon has been recently offered full time traditional employment, he has been reluctant to accept given the uncertainty of his continued availability arising from his sentencing in this case.

    *2.    The Offense.*

On April 28, 2006, Jon plead guilty to two counts of wire fraud in violation 18 U.S.C. § 1343 and to one count of conspiracy to commit money laundering in violation 18 U.S.C. §§ 1956(h) and 1957. The wire fraud offenses are specifically set forth in counts 16 and 58 of the superseding indictment and the money laundering offense is set froth in count 69. The remaining charges of the superseding indictment against Jon were dismissed. There were 68 properties involved in the wire fraud counts and an additional 28 properties set forth in the money laundering offense. Of these 106 transactions, Jon was alleged to have been involved as an appraiser in 35.

Beginning in 1999, Jon was approached by the principals in this scheme, Petropolous, Beals, Bergdoll and then Matos. They presented as legitimate and successful businessmen. They explained that they endeavored to assist those with poor credit to achieve affordable home ownership. They stated that they purchased derelict inner-city properties and repaired them for sale to buyers who could not otherwise qualify for ownership. In most of the transactions in which Jon was involved, the repairs were made by the principals without incident.

For instance, in the specific transaction to which Jon plead guilty, that involving the property and loan at 34 Daytona Street, Jon was asked by the principals to appraise the properties with an "as repaired" value before the full repairs were actually completed. They explained and promised that the repairs would be made and stated that the as repaired appraisals would expedite the closing process and work to the benefit of the buyers.

Relying upon the good faith of the principals, and the fact that they had performed past repairs without fail, Jon appraised the properties to the value they would have had if repaired, even though the repairs were not done. This was the sum and substance of the most egregious type of affirmative misrepresentation and fraud in which Jon engaged. (PSR, p. 44-45).

Jon honestly believed in good faith that the principals would make the repairs and that his misstatements in the appraisals would work to the benefit of the purchasers in the form of expedited closings. There is no suggestion in the record that, during the course of his activities, Jon knew that promised repairs were not or would not be made by the principals. Once he did become aware of problems with repairs not being made, he immediately terminated his work with these individuals. In essence, the primary perpetrators gained Jon's trust and duped him into believing that his actions were harmless paperwork oversights that would benefit the purchasers.[1] In this fundamental way, Jon was himself the victim of the primary perpetrators of the scheme.

Unlike the other defendants, and apart from these "as repaired" appraisals, Jon did not knowingly prepare or submit false or fictitious documents. Unlike the other defendants, he did not knowingly defraud others for his personal gain. He did not in any way reap illegal profit from his activities, receiving only his usual fee of approximately $300 per appraisal. Unlike the other appraiser involved in this case, Joseph Sullivan, Jon did not

---

[1] As the letters of reference submitted to the Court indicate, Jon tends to place extraordinary trust in others. This has caused some difficulty in his personal life and to a degree serves to explain his current predicament.

seek or accept bribes to inflate appraisals. Jon, unlike Sullivan, did not give the land flippers "any value that they wanted." (PSR, p. 45).

    3.    *The Sentencing Guidelines.*

The court must fashion "a sentence sufficient, but not greater than necessary," for the achievement of the legitimate objectives of sentencing. 18 U.S.C. § 3553(a). *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (declaring the federal sentencing guidelines advisory); *United States v. Jiménez-Beltre,* 440 F.3d 514 (1st Cir.2006) (instructing district courts on the process for imposing sentence post-*Booker*). Although the guidelines have become advisory rather than mandatory, determining the correct guidelines sentencing range ("GSR") remains an appropriate starting point for constructing a defendant's sentence. Once the sentencing court has established the GSR, including a consideration of any applicable departures, it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a), along with any other relevant considerations. Finally, it must determine, in light of that assessment, whether a sentence above, within, or below the GSR is warranted. *United States v. Alli,* 444 F.3d 34, 40 (1st Cir. 2006).

The Court in this case has chosen to impose the *Starnes* method for loss calculation under the guidelines. Under this method, the Court has concluded that the loss attributable to each defendant equals the amount of the loan in which he or she participated, minus what the conspirators paid for the property prior to the loan. (PSR, p. 94). As applied to Jon, and according to the PSR, this results in a loss of $1,433,722.

Under USSG § 2B1.1(b)(1)(I), this translates to an Offense Level of 22. A two level enhancement is added under USSG § 2B1.1(b)(2)(A) because more than 10 victims were involved. A one level enhancement is added because of the money laundering charge. Finally, an additional two level enhancement is added because, under USSG § 3B1.3, Jon abused a position of trust. After the three level downward adjustments for acceptance of responsibility, there remains a Total Offense Level of 24. Based upon a Total Offense Level of 24 and a Criminal History of I, the PSR concludes that the GSR is 51 to 63 months. (PSR, p. 106). For the reasons that follow, Jon respectfully maintains that the GSR is inaccurate and far beyond what is required in his case to achieve the legitimate objectives of sentencing under § 3553(a).

   a. *The* Starnes *Loss Calculation Method is Inappropriate and Overstates the Offense as to Jon.*

In the calculus of USSG § 2B1.1(b), [2] loss to the victim determines both the defendant's culpability and the seriousness of the offense. *United States v. Parsons,* 141 F.3d 386, 392 (1st Cir.1998) (loss is a proxy for the seriousness of the offense). On the factual issue of the quantum of loss, the government bears the burden of proof where, as in this case, an increase in the base offense level is sought. See *United States v. Sklar,* 920 F.2d 107, 112 (1st Cir. 1990). The government must prove the loss by a preponderance of "specific and reliable evidence." *United States v. Sepulveda ,*

---

[2] The Guidelines in effect at the time of the commission of the instant offense - the Guideline Manual issued November 1, 2001 – are controlling. This is because that version is more beneficial to the defendants than the version of the Guidelines in effect at the time of sentencing. See *United States v. Harotunian,* 920 F.2d 1040, 1041-42 (1st Cir. 1990).

115 F.3d 882, 889 (11th Cir. 1997). While the guideline indicates that the "court need only make a reasonable estimate of the loss . . .," such an estimate "shall be based on available information, taking into account, as appropriate and practicable under the circumstances," the factors enumerated. USSG § 2B1.1, Note 2C.

USSG § 2B1.1, Note 2A defines "loss" as "the greater of actual loss or intended loss." Further relevant definitions are:

>  (i) <u>Actual Loss</u>.—"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
> 
>  (ii) <u>Intended Loss</u>.—"Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.,* as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).
> 
>  (iii) <u>Pecuniary Harm</u>.—"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.
> 
>  (iv) <u>Reasonably Foreseeable Pecuniary Harm</u>.—For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

Where loan fraud is at issue, the Guidelines recognize an exception to the usual methods of calculating loss set forth in § 2B1.1. *United States v. Stein,* 233 F.3d 6, 18 n. 8 (1st Cir.2000), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1406, 149 L.Ed.2d 348 (2001). Specifically, USSG § 2B1.1, Note 2E provides that loss shall be reduced by "[i]n a case

involving collateral pledged or otherwise provided by the defendant,[3] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."

Before the Court on the issue of loss is the Affidavit of Holly Huebner Ryan, CPA, an expert in loan loss evaluation. Supported by her expertise and extensive analysis, Ms. Ryan concluded that the four lenders to whom Jon provided appraisals in this case, Equicredit, Diverse, McCue and Countrywide, each sustained no losses on the bundle of loans written in this case. In fact, each realized a gain on the bundle of loans. Ryan Aff. ¶ 27. Despite this, the Court has chosen to adopt the *Starnes* formula. That formula is not appropriate because it does not attempt to address either any objective actual loss or the value of the collateral either at the time of disposition or at the time of sentencing. The *Starnes* formula ignores the objective realities which, according to Ms. Ryan, show minimal if any loss in this instance. While the *Starnes* formula may comprehend "reasonably foreseeable pecuniary harm," this is simply a causation element and not the measure of the loss. To be included as loss, such harm must nonetheless have "resulted from the offense." Similarly, there is no evidence that Jon "intended loss" to the banks or the victims. He in fact believed and expected that the repairs would be completed.

---

[3] The phrase "collateral pledged or otherwise provided by the defendant" is not limited to collateral pledged by the defendant seeking credit. See *Federal Sentencing Guidelines Handbook*, p. 324 (West 2006 ed.) Mortgages were secured by Inarelli and provided to the banks. The Banks suffered only one financial loss per transaction resulting from the concerted action of the defendants. This loss is objectively measurable by subtracting the value of the collateral from the amount of the loan. It would be illogical and unjust to deny the collateral credit to Jon because he did not actually give the mortgage.

For these reasons, Jon respectfully maintains that the Court's loss assessment is rendered arbitrary in the circumstances. Moreover, because the government has not met its burden of proof on the issue of loss, a sentence principally based upon a flawed loss calculation would be unjust.

Similarly, with respect to the purchasers of the properties, there is no meaningful evidence of the losses sustained by them. Many if not most of the purchasers were complicit in the wrongdoing, and it would be unfair to characterize these individuals as victims. It is not disputed that many made or adopted false statements or documents and thereby became parties to the fraud. Further, those who were truly victimized did receive some value in the transactions. Several of the loans are still performing. All purchasers received a home of some value for some length of time. Many would have not have otherwise owned homes. What is apparent on the question of purchaser victim loss is that accurately quantifying such loss is nearly impossible.

To further complicate the loss calculation, it must be recognized that Jon alone was not responsible for whatever losses resulted from the loans he appraised. Several of the principal perpetrators were more directly involved in and responsible for the fraud and loss in each of these loans. "[T]he victim loss table in § U.S.S.G. [2B1.1(b)(1)] presumes that the defendant alone is responsible for the entire amount of victim loss specified in the particular loss range selected by the sentencing court." *United States v. Gregorio*, 956 F.2d 341, 346 (1st Cir.1992)(interpreting 2F1.1(b)(1), the predecessor to the provision at issue). Pursuant to USSG § 2B1.1(b)(1), any portion of the total loss sustained by a

9

victim as a consequence of factors extraneous to the defendant's criminal conduct is not deducted from total "victim loss" prior to the determination of the applicable guideline sentencing range. Because of the distortive effect that these extraneous causes may have on the total "victim loss" calculation, a departure from the applicable guideline sentencing range is appropriate. See U.S.S.G. § 2B1.1, Application Note 15B ("downward departure may be warranted" where "the offense level determined under this guideline substantially overstates the seriousness of the offense."). This "typically occur[s]" when defendant's fraud "is not the sole cause of the loss", *United States v. Kopp,* 951 F.2d 521, 531 (3rd Cir.1991) ("To the extent actual loss had other, more proximate causes, a discretionary downward departure - but not a mandatory 'loss' adjustment - might be appropriate.").

In this instance, there can be little doubt but that Jon himself was not responsible for losses totaling $1,433,722. Nor can there be any doubt but that a corresponding Offense Level of 22, with a basic corresponding GSR of 41 to 51 months, substantially overstates both the seriousness of the offense and the scope of Jon's involvment in causing a discernable loss. For this reason alone, a discretionary downward departure is warranted and appropriate.

From all of this, it is obvious that the loss calculation as to Jon is fraught with difficulty and uncertainty. While Jon does not argue that his conduct was without negative consequence, he maintains that in the circumstances of his involvement, an accurate calculation of loss under § 2B1.1 can neither be made nor reasonably or fairly

estimated. To the extent that Jon's freedom is at stake and precariously hangs in the balance, an accurate loss assessment is essential.

In their wisdom, the Guidelines address just this situation. Specifically, the Guidelines provide that "The court *shall* use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." See U.S.S.G. § 2B1.1, Application Note 2B (emphasis added). This directive appears to be mandatory in a case such as this where "there is a loss but it reasonably cannot be determined."

As previously indicated, Jon received no untoward gain from his involvement in the transactions. He received only his usual and customary fee of approximately $300. Even though he went unpaid in several of the transactions, he will acknowledge for purposes of analysis that his gain was $10,500, representing an average fee of $300 over the 35 transactions in which he was involved. Under USSG § 2B1.1(b)(1)(C), this translates to an Offense Level of 10.

      b.    *The Victim Enhancement is Inappropriate.*

The PSR adds a two level enhancement under USSG § 2B1.1(b)(2)(A) because more than 10 victims were involved. While there is proof that Jon provided appraisals to four banks, there is no clear proof that the individual purchasers are victims for sentencing enhancement purposes. Again, several of the individual purchasers were participants in the scheme. Because these "purchaser victims" were actually coconspirators, who had the presumed and shared object of defrauding the banks, there is

11

a serious question as to whether they are victims at all. See *United States v. Manfre*, 368 F.3d 832 (8th Cir. 2004)(defendant's coconspirator in an arson case who died in the fire was not a victim because the target of the offense, i.e. the real victim, was the insurance company who the deceased sought to defraud.) See also USSG § 5K2.10(recognizing victim misconduct as a basis for downward departure).

Even assuming and acknowledging that some of the purchasers were in fact victims, there is no credible record before the Court concerning the identity of the complicit and noncomplicit purchasers or whether they were necessarily involved in the transactions in which Jon was involved. For these reasons, and because the government has failed to show by credible evidence that more than 10 victims were involved, there should be no two level enhancements under USSG § 2B1.1(b)(2)(A).

   c. *A Minor Participant Adjustment Should be Applied.*

The Guidelines allow an adjustment for a defendant whose part in the offense of conviction dilutes his culpability. Specifically, there exists a two-level downward adjustment for minor participation in the criminal activity at issue. See USSG § 3B1.2(b). To qualify as a minor participant, a defendant must prove that he is both less culpable than his cohorts in the particular criminal endeavor and less culpable than the majority of those within the universe of persons participating in similar crimes. *United States v. Santos*, 357 F.3d 136, 142 (1st Cir. 2004).

Apart from the appraisals inaccurately valuing properties yet to be repaired, Jon did not blatantly misrepresent facts, he did not forge and falsify documents, he did not

take bribes and kickbacks and he did not profit from his activities. He in fact reasonably believed in good faith that the repairs would be made. He himself was duped by the perpetrators. Most importantly, he was unaware of the scope and structure of the enterprise and of the activities of the others involved. Unlike Joseph Sullivan, the other appraiser involved, Jon did not provide the perpetrators any value they wanted. Jon is plainly among the least culpable of these involved in this and similar crimes. Jon respectfully maintains that he qualifies for this two level adjustment.

        d.      *The Appropriate Guideline Sentencing Range.*

For the reasons set forth above, Jon maintains that under USSG § 2B1.1(b)(1)(C), the appropriate base Offense Level is 10. There should not be a two level enhancement under USSG § 2B1.1(b)(2)(A) because it has not been established that more than 10 cognizable victims were involved. A one level enhancement is conceded because of the money laundering charge. An additional two level enhancement is added because, under USSG § 3B1.3, Jon presumably abused a position of trust. There should be a two level minor participant adjustment under USSG § 3B1.2(b). Thus, and after the three level downward adjustment for acceptance of responsibility, there remains a Total Offense Level of 8. Based upon a Total Offense Level of 8 and a Criminal History of I, the GSR is 0 to 8 months.

Assuming for analysis that the Court were to either impose the victim enhancement or to reject the minor role adjustment, the Total Offense Level would be 10 and the GSR would be 6 to 12 months. This is within Zone B of the Sentencing Table. Zone B

offenders are eligible to serve either a "sentence of imprisonment" or a "sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention ... or a sentence of probation that includes a condition or combination of conditions the substitute intermittent confinement, community confinement or home detention for imprisonment . . ." USSG § 5C1.1( c ). As a Zone B offender, Jon could be placed in community confinement or home detention. This would allow him to obtain available employment to support his family. This would also allow him closer proximity to his family to meet their emotional needs and his family responsibilities. Finally, this would avoid the expense to the government of incarcerating Jon with no societal benefit.

Assuming again for analysis that the Total Offense Level were increased to 11 or 12, the GSR would be 8 to 14 or 10 to 16 months respectively. This would place Jon in Zone C. Zone C offenders are to serve either a "sentence of imprisonment" or a "sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention ... provided that at least one-half of the minimum term is satisfied by imprisonment." id. USSG § 5C1.1(d)(2).

    *4.    The goals of the Sentencing Reform Act would best served and satisfied by a Zone B Guideline Range of 6 to 12 months allowing Jon be employed.*

In the end, the Court must fashion "a sentence sufficient, but not greater than necessary," for the achievement of the legitimate objectives of sentencing. 18 U.S.C. § 3553(a). *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Irrespective of the Court's Guideline calculation, the Court must be ever mindful of the

goals of the Sentencing Reform Act. As Judge Lipez observed in his dissent in *U.S. v. Jimenez-Beltre*, 440 F.3d 514, 528 n. 11 (1st Cir. 2006):

> Many commentators argue that by giving the guidelines controlling weight, and abdicating the responsibility to take account of the other section 3553(a) factors, courts "effectively mak[e] the guidelines as binding as they were before *Booker*," thereby violating *Booker's* constitutional command. Mccolgin & Sweitzer, *supra,* at 53; *see also* Frank O. Bowman, III, *Beyond Band-Aids: A Proposal for Reconfiguring Federal Sentencing After Booker,* 2005 U. Chi. Legal F. 149, 183 (2005). Justice Stevens made a similar point in his dissent in *Booker,* stating that the "sentencing range is now nothing more than a suggestion that may or may not be persuasive to a judge when weighed against the numerous other considerations listed in [section 3553(a) ]."243 U.S. at 300, 37 S.Ct. 273 (Stevens, J., dissenting in part). Justice Scalia wrote to the same effect, stating that "logic compels the conclusion that the sentencing judge, after considering the recited factors (including the Guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range. If the majority thought otherwise ⋯ its opinion would surely say so." *Id.* at 305, 37 S.Ct. 273 (Scalia, J., dissenting in part). To be sure, these are dissents to the remedial decision in *Booker,* which does not elaborate on its statement that the guidelines must be "consider[ed]" post- *Booker*. But given the close divisions on the Court about the post- *Booker* role of the guidelines, and given the new composition of the Court, it would be foolhardy to ignore the constitutional dangers of adopting an approach to the guidelines post- *Booker* that approximates, in a new guise, the mandatory guidelines.

Post - *Booker*, and along with the Guidelines, the Court must weigh and account for each of the sentencing goals identified in the Sentencing Reform Act. See 18 U.S.C.A. § 3553(a) (Supp. 2004).[4] The Supreme Court in Booker wrote that "[t]he Act

---

[4] 18 U.S.C.A. § 3553(a) provides that:

(a)The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed--

15

requires judges to consider the Guidelines "sentencing range established for ... the applicable category of offense committed by the applicable category of defendant," § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7). And the Act nonetheless requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just

---

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B) to afford adequate deterrence to criminal conduct;
      (C) to protect the public from further crimes of the defendant; and
      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

      (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
            (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
            (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

      (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--
      (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
      (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care. § 3553(a)(2)."

Jon's involvement with his co-defendants has already been catastrophic. Prior to this series of events, Jon lived a respectful and law abiding life. He enjoyed a satisfying profession and the respect of his peers and of his family. As a result of this case, he was arrested in the presence of his wife and sons. He has suffered deep disgrace before his community and his family. He has forever lost his lifelong professional avocation. Although he fully accepts responsibility for his actions and conduct, he respectfully asks that the Court be cognizant of the grave punishment and loss he has suffered and will for the rest of his days endure.

In this case, the purposes at the base of the Sentencing Reform Act would best be served by a term of incarceration in the form of home detention or community confinement within the appropriate Guideline range of between 6 and 12 months. This will allow Jon to continue with the financial and emotional support of his family. No legitimate societal purpose will be served by a term of lengthily prison confinement and incarceration. In light of Jon's circumstance, the term he has proposed fairly and reasonably reflects the seriousness of the offense, promotes respect for the law, provides just punishment, and affords adequate deterrence.

5.  *Conclusion.*

For these reasons, the defendant, Jonathan Frederick, respectfully requests that the court impose a sentence of pursuant to the Sentencing Reform Act within the range of 6 to

12 months to be served by a term of incarceration in the form of home detention or community confinement.

Dated: September 18, 2006

THE DEFENDANT,
JONATHAN FREDERICK,

By: /s/ Mark J. Albano
Mark J. Albano, Esq.
DALSEY, FERRARA & ALBANO
73 State Street, Suite 101
Springfield, MA 01103
Tel. No.: (413) 736-6971
Fax No.: (413) 746-9224
Email: malbano@dalsey-ferrara.com
B.B.O. No.: 013860

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2006, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies have been sent to the party indicated below which on this date was a non-registered participant:

Richard Rinaldi, U.S. Probation Office
UNITED STATES DISTRICT COURT
Probation Department
1550 Main Street, Room 212
Springfield, MA 01103

/s/ Mark J. Albano
Mark J. Albano, Esq.